## VIRGINIAN RY. CO. v. LAKE & EXPORT COAL CORPORATION.

(Circuit Court of Appeals, Fourth Circuit. April 14, 1925.)

No. 2316.

Carriers ⬡⟶100(1)—Carrier unable to fix definite amount of demurrage recoverable from shipper, member of coal exchange held not entitled to recover.

Where, under agreement between railroad and coal exchange, cars for purpose of demurrage charges were treated as having arrived upon exchange's receipt of notices of arrival sent by railroad, and exchange was not required to release cars in order received and was entitled to credit early release against tardy release of others, and where through mistake of railroad's employees no notices of arrival were sent out for some 880 cars, *held*, railroad seeking to recover from shipper, member of coal exchange, its share of demurrage charges, being unable to show what sum, if any, plaintiff owed, could not recover; nor was it entitled in adjustment of difficulty to assume that there had been neither free time nor demurrage on the cars no notice of arrival of which had been given.

In Error to the District Court of the United States for the Eastern District of Virginia, at Norfolk; D. Lawrence Groner, Judge.

Action by the Virginian Railway Company against the Lake & Export Coal Corporation. Judgment for defendant, and plaintiff brings error. Affirmed.

W. H. T. Loyall, of Norfolk, Va. (W. C. Plunkett, of Norfolk, Va., on the brief), for plaintiff in error.

Tazewell Taylor, of Norfolk, Va., and Karl Knox Gartner, of Washington, D. C., for defendant in error.

Before WOODS, WADDILL, and ROSE, Circuit Judges.

ROSE, Circuit Judge. The parties occupied the same position below as they do here; that is, the Virginian Railway Company, plaintiff in error, was the plaintiff, and the Lake & Export Coal Corporation, defendant in error, was the defendant. For brevity we will refer to them respectively as the railway and the shipper.

The shipper was a member of Sewell's Point Coal Exchange and in the winter and spring of 1921 shipped many carloads of coal over the railway to the exchange for export. By agreement of all concerned in the primary calculation of the amount of demurrage, if any, which might be due the railway, the exchange was treated as if it was the sole consignee of all the coal of its members, although each member signed an agreement with the railway becoming personally liable for all demurrage charges which upon apportionment by the exchange, might be assigned to him by its commissioner. At the time of the shipments, the railway tariffs filed with the Interstate Commerce Commission provided an average of five days' free car time, and required notice of arrival to be sent or given to the consignee upon the arrival of a car and billing at Sewall's Point. It was further provided that a car should be considered as released at the time the vessel registered for cargo or for fuel supply, of which the coal dumped into it was a part, except that when cars were unloaded before the vessel registered, they were to be regarded as released when unloaded. It was further provided that to reduce switching and to prevent delays, cars might be delivered otherwise than in the order of their arrival. In that event the dates upon which the substituted cars were delivered were to be used in computing the detention of the cars for which they were substituted, so that as far as credit and debit days were concerned, the record should be the same as though the cars were delivered in the order of their arrival.

It followed that the ordinary method of making up the account was to charge each car as having arrived on the day notice of arrival was given, and to enter it as having been discharged on the first day thereafter at which it would have been discharged if it had been unloaded immediately after every car which had arrived before it had been emptied and before the unloading of any car which arrived subsequently. If in this way a car was unloaded two days after notice of its arrival had been given, there was a credit of three days' free time to be made against any charge of demurrage the railway might have on any car not unloaded until after five days.

It so happened that in the winter and spring of 1921, by a mistake of a clerk of the railway, notices of arrival were never sent out for some 880 cars. Some months later, the error was discovered, and then the railway undertook to adjust it by assuming that there had been neither free time nor demurrage upon any of these 880 cars. There was an attempt made to support this way of dealing with the problem by setting up the legal theory that a notice of arrival had to be given before the cars could be regarded as entitled to free days or subject to demurrage. It is quite obvious, however, that the rights of shippers could not be dependent on the failure, accidental or intentional, of the employee of the railway to give the notice to which they were entitled. The evidence raised a serious question as to whether, had the dates of arrival been actually ascertained, the exchange would not have been entitled to credit for many more free days than were actually given it, and in that event, of course, the shipper would have had its proportion of such credits.

In this state of the proof, the court properly instructed the jury that the railway had not shown, by any conpetent evidence, what sum, if any, the shipper owed it, and therefore that their verdict must be for the latter. Put in another way, the railway's employees had blundered. As a consequence of their blunder, it was impossible to tell whether the shipper owed it anything and, if it did, how much. The trouble was of its making, and the loss, if any, must be borne by it. There is no suggestion of any collusion between the employees of the railway and the shipper, and therefore no question of any favoritism exhibited to the latter.

The conclusion we have reached renders unnecessary the consideration of several other defenses set up by the shipper.

Affirmed.